Filed 10/27/15

<u>**CERTIFIED FOR PARTIAL PUBLICATION**</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F068226 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. CRM007460A) |
| BRYAN DAVID BRIDGEFORD, | **OPINION** |
| Defendant and Appellant. | |

-ooOoo-

APPEAL from a judgment of the Superior Court of Merced County. Donald J. Proietti, Judge.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez and Charity S. Whitney, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts II, III, IV, V and VI of the Discussion.

# INTRODUCTION

Following a jury trial, appellant Bryan David Bridgeford was convicted of murder in the first degree of both Leonel Medina (count 1) and Juan Eduardo Avalos (count 2). (Pen. Code,[1] § 187, subd. (a).) As to both counts, the jury found true that appellant committed the crimes while an active participant in a criminal street gang (§ 186.22, subd. (b)(5)); intentionally and personally discharged a firearm (§ 12022.53, subd. (d)); the murders furthered criminal street gang activities (§ 190.2, subd. (a)(22)); and he committed multiple murders (§ 190.2, subd. (a)(3)). He was also convicted of active participation in a criminal street gang (§ 186.22, subd. (a); count 3).

Regarding counts 1 and 2, appellant was sentenced to consecutive terms of life without possibility of parole. Consecutive terms of 25 years to life were added pursuant to the firearm enhancements. The sentence on count 3 and the remaining special allegations were stayed pursuant to section 654.

Before trial, the trial court denied appellant's motion to suppress statements he made to law enforcement during two separate interviews. The first interview ended when appellant invoked his right to counsel under *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). He was released from custody but law enforcement arrested him later that same day, gave him new *Miranda* warnings, and appellant agreed to talk. During the second interview, appellant eventually confessed that he shot both Medina and Avalos.

Appellant raises six issues on appeal, and we find merit to his first claim. In the published portion of the opinion, we address his argument that the trial court prejudicially erred when it failed to apply *Maryland v. Shatzer* (2010) 559 U.S. 98 (*Shatzer*) in deciding his suppression motion. Under *Shatzer*, law enforcement must wait 14 days before it may resume questioning (absent initiation by the suspect or with the presence of counsel) after a suspect has invoked his or her right to counsel and is released from

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

custody.  (*Shatzer, supra,* 559 U.S. at pp. 105, 110.)  The trial court erred in not applying *Shatzer* because the requisite 14-day break-in-custody did not occur in appellant's case.  As discussed in part I of the Discussion, this error was prejudicial, requiring reversal of appellant's convictions and a remand for new trial.

In the unpublished portion of the opinion, we address appellant's remaining five contentions on appeal and the scope of retrial to assist the parties on remand.  Appellant asserts the totality of the circumstances demonstrates his statements were coerced after his arrest and during the second interview because he discussed witness protection with the detectives.  We find no such coercion.

Appellant claims his recorded conversation with an accomplice, which occurred during the second interview, should have been suppressed under the "fruit of the poisonous tree" rule as a result of the police coercion.  Although suppression is required under *Shatzer*, we disagree that suppression is warranted under the alternative argument appellant presents on appeal because no such coercion occurred.

The parties agree, as do we, that the trial court erred regarding certain jury instructions: the court gave an incorrect instruction with CALCRIM No. 301 and it failed to instruct regarding the charged firearm enhancements.  The parties, however, disagree whether these instructional errors were prejudicial.  In light of the remand, we will not address the disputed prejudicial impact of these errors or appellant's last argument that his right to due process of law was violated from cumulative errors.

We reverse the judgment and remand for a new trial consistent with this opinion.

## FACTUAL BACKGROUND

### I.     The Prosecution's Case.

#### A.     The uncharged home invasion robbery.

In the early morning hours on January 4, 2010, a home invasion robbery took place at the residence of Jacob McEver on Golden Gate Avenue in Dos Palos, California.  McEver was awake.  Three individuals entered his home wearing dark pants and shirts.

3.

One of them wore a hoodie and the other two may have been wearing beanies. All three wore masks, which appeared to be shirtsleeves covering their lower faces and noses. One of the individuals carried a rifle with a "see-through clip" that was "very distinguishable." That individual told McEver to get on the ground because he was being robbed.

During the robbery, one suspect called another one "Bryan." McEver knew appellant because they grew up together and lived approximately half a block apart. They had played basketball together on several occasions. After the name "Bryan" was used, McEver recognized appellant from his "tall and lanky" body type, his voice and "very distinguishable facial features." At trial, McEver identified appellant as the person who was holding the rifle during the invasion of his home.

### B. The homicides and subsequent investigation.

The day after the McEver home invasion robbery, Medina and Avalos, both Sureño gang members, were shot to death in Medina's garage located on Highway 33 in Dos Palos. Both victims suffered multiple gunshot wounds. Stippling to one of Avalos's wounds near his right ear (caused by a rifle or handgun) indicated the shooter was approximately two to four feet away. No other wounds on either victim exhibited stippling or gunpowder soot. Inside the garage, law enforcement discovered and collected approximately six spent 12-gauge shotgun shells and approximately 10 spent .22-caliber cartridges. Both victims were struck from both weapons, and shots from the .22-caliber rifle were potentially fatal for both victims. The forensic pathologist who performed the autopsies listed the cause of death for both victims as "multiple gunshot wounds."

The shotgun shells were all from the same brand and make, which a local Walmart sold. Law enforcement reviewed that Walmart's video surveillance. The day before these shootings, appellant, along with Jose German, Anthony Gonzalez, and Henry Delatorre, were recorded entering the Walmart. Everyone except for German was wearing a black beanie. At some point, all four individuals went to the sporting goods

4.

department and they looked at ammunition. Appellant and Gonzalez stayed at a counter while the other two went down an aisle where these particular shotgun shells were displayed on a rack. Appellant and Gonzalez appeared to reach for something behind the counter while no employees were present, but the viewing officer could not determine why or for what they reached. The video later shows all four individuals exiting the store with a Walmart bag, and something appears inside the bag. No ammunition matching the evidence at the crime scene was purchased from Walmart that day.

On January 6, 2010, Dos Palos Police Chief Barry Mann went to appellant's home as part of the investigation into the robbery at McEver's home. Mann asked appellant if he knew why Mann was there. Appellant said yes, "because of the stuff that happened on the highway." Mann was surprised and explained he was there regarding stolen property. He asked if he could search appellant's residence because appellant's name had come up. Appellant refused and Mann pleaded with him, reminding appellant he had entered his residence numerous times before to provide medical aid for his grandmother. Mann said he would return with a search warrant. Appellant would not allow Mann to enter so he left.

On or about January 6, 2010, law enforcement recovered a white GMC Yukon which had been stolen on December 30, 2009. DNA testing indicated a bloodstain found inside the Yukon matched Avalos's DNA profile.

On January 12, 2010, law enforcement searched German's home, discovering and collecting a .22-caliber semi-automatic rifle in his bedroom. The rifle had been hidden in his bed between a mattress and a box spring. The rifle had an aftermarket detachable magazine. Subsequent testing indicated this rifle fired the .22-caliber cartridges found at the scene of the homicides. At trial, McEver identified the rifle seized from German's bedroom as the rifle he saw appellant holding during the invasion of his home.

5.

## C.    Appellant's confession.

On January 12, 2010, law enforcement interviewed appellant commencing at approximately 8:45 a.m.  The interview was recorded and played for the jury.  During the first interview, appellant said he wanted a lawyer and the interview immediately ceased.  Appellant was released.

Later that same day following additional investigation, law enforcement established probable cause and arrested appellant approximately three hours after the first interview.  They then interviewed him a second time and the second interview was also recorded and played for the jury.  During the second interview, appellant initially denied being a shooter or knowing the identity of the shooters.  Law enforcement placed appellant and German in the same room together to talk.  German told appellant that law enforcement had the murder weapon, and knew appellant and Delatorre were the shooters.  When the detectives reentered the interview room, German remained and appellant confessed three minutes later that he shot both victims with the .22-caliber rifle.  He said Delatorre used the shotgun.  Appellant denied being involved in the home invasion robbery at McEver's residence.

## D.    Gang evidence.

The prosecution's gang expert testified regarding the history of the Norteño and Sureño gangs.  She opined that Avalos and Medina were active Sureño criminal street gang members on the day they were killed.  She opined that appellant, German, Delatorre and Gonzalez were all active Norteño gang members as of the date of these shootings.  She opined that the facts of the case indicate the crime was gang related, committed for the benefit of a criminal street gang, and it was intended to further criminal activity by gang members.

## E.    German's trial testimony.

German testified at trial under a use-immunity agreement which he signed on the morning of his testimony.  He was originally charged with murder but at the time of his

trial testimony he was facing charges as an accessory after the fact. On January 4, 2010, he went to Walmart to service his vehicle, and he was accompanied by appellant, Delatorre and Gonzalez. As of that date, all four of them were members of the North Side Barrio Locos, a Norteño gang. They walked around Walmart and looked at bullets. They ate at the McDonald's and then left. German dropped the others off and he went home. German denied being present at the scene of the homicides.

The next morning, German received a phone call from Delatorre, and he picked up Delatorre and appellant at the residence of Delatorre's girlfriend. Appellant had the rifle and was wearing black clothes. On their drive back to Dos Palos, appellant told German that he and Delatorre had shot the two guys who lived "at that house." Appellant told German that he "emptied the clip."

A "couple of days" before these murders, German had been driving past Medina's house on Highway 33 when someone threw a brick or a rock at his vehicle from that residence. German lived several miles from Medina's residence, and he knew the two individuals there were gang members. At trial, German initially stated he was not angry that someone from Medina's house threw a rock at his vehicle, but he then admitted he was "a little upset." German told police it was a "Marcos" who threw the brick, whom appellant considered to be his enemy.[2] Appellant told officers the brick was thrown at his vehicle on the same day he went to Walmart. He told police that the brick hit his vehicle, but he told the jury that the brick missed. He explained to the jury that he lied to police because he did not want to tell them the truth. On the way to pick up Delatorre, German drove past Medina's residence and he saw law enforcement there. German told the jury he did not know why police were there and did not know anything about the murders.

---

[2] Marcos Medina is the brother of Leonel Medina.

German testified that appellant gave him the rifle because appellant was nervous after Mann visited appellant's residence. According to German, appellant did not specifically tell him if the rifle had been involved in a shooting. German said he received the rifle a "couple of days" after the group went to Walmart. He hid the rifle in his bed and it had been there "[m]aybe a day" before the police searched his home on January 12, 2010. German, however, initially told police he had had the rifle in his car for a couple of days and appellant could not have handled it.

After the police searched his home on January 12, 2010, German went to the police station where he was given his *Miranda* rights and agreed to talk. At trial, German admitted he lied to the police because he did not want to be a snitch. At that time, he considered appellant and Delatorre as his friends. German initially told police he found the rifle on a canal bank, and then he said he bought it "from some black guy" for $75. He said the "black fool" was at that shooting and German paid him $75 to go kill somebody. In a later story, German said two members of a different gang gave him the rifle and those two individuals committed the murders. At trial, German agreed he had trouble remembering everything he said to police because much of what he said was a lie.

### E.      Appellant's recorded jail calls.

While in jail, appellant made two telephone calls which were recorded and played for the jury. In the first call, appellant told a family member he was getting charged for murder. The family member indicated law enforcement had no evidence against him. Appellant replied that they found the rifle at German's house. Appellant later repeated that law enforcement found the gun.

In the second recorded phone call, the same family member asked what appellant said to police. Appellant said that German "snitched" and appellant told police he "did it" and told police "it was me" because German made him. When asked why he would do that, appellant said he did not know why and it was "stupid." Appellant said he felt

8.

pressured once German was put into the room with him and he felt like "they" were going to kill him if he did not.

**II.  Defense Evidence.**

Appellant called two witnesses in his defense.  His uncle testified he had known appellant since he was a child.  Appellant was not a violent person and was "mild mannered and good hearted."  Appellant's uncle believed appellant told the truth.

A clinical psychologist, Dr. Bobby Tehrani, opined appellant had below-average to borderline intellectual functioning, a low IQ, a learning disability, a bad memory, poor verbal skills, difficulty paying attention, and poor problem-solving skills.  Appellant was in special education classes since fourth grade and did not graduate from high school.  Appellant appeared confused by questioning and verbal instructions

## DISCUSSION

**I.  The Trial Court Prejudicially Erred When It Failed To Apply *Shatzer*.**

**A.  Background.**

Prior to trial, the court conducted a suppression hearing regarding the admissibility of appellant's statements to law enforcement.  The prosecution elicited testimony from five witnesses, all of whom worked for the Merced County Sheriff's Department: (1) Charles Hale, a sergeant; (2) Jason Jacklitsch, a deputy; (3) Corey Gibson, a sergeant; (4) Alex Barba, a deputy; and (5) Jason Goins, a deputy.  The defense called a single witness, Thomas Gary Menzel, who is related to appellant.

**1.  Relevant evidence from the suppression hearing.**

Hale interviewed appellant twice on January 12, 2010.  The first interview occurred at approximately 8:45 a.m. at the Los Banos station of the Merced County Sheriff's Office.  A search warrant had been executed at appellant's residence earlier that morning and appellant had been transported to the station.

We have reviewed the recording of the first interview.  Appellant is seen wearing handcuffs as the interview begins.  At no time during this 16-minute interview are the

9.

handcuffs removed. On cross-examination, Hale was asked if appellant was handcuffed during the first interview. The following exchange occurred:

"[Hale]: He might have been when he was brought in, but I think they were taken off during the interview. I think the video shows that.

"[Prosecutor]: The first interview we saw handcuffs at the very beginning.

"[Hale]: Right. That's –

"[Defense counsel]: I would just say that I believe it's been agreed between the defense and the prosecution that [appellant] was, in fact, handcuffed at that first meeting as is apparent from the video.

"[Hale]: Yes.

"[Defense counsel]: Does that refresh your recollection?

"[Hale]: That's what I said."

Hale told appellant he was detained but not under arrest. Hale had a search warrant for appellant's DNA, which he would discuss later. Appellant was read his *Miranda* rights, which he waived. During the interview, appellant asked for a lawyer and the interview was terminated. Hale believed appellant was then transported back to Dos Palos.

However, Menzel, who is related to appellant by marriage, testified that he picked up appellant at the police substation at approximately 10:30 a.m. after the first interview ended. Menzel drove appellant home and then to a recycling center in Dos Palos. Menzel described appellant as calm when he picked him up. At approximately 1:30 p.m. that same day, deputies arrived at the recycling center and appellant left with the deputies.

At the end of appellant's first interview, law enforcement did not have sufficient probable cause for his arrest. After appellant was released, however, law enforcement obtained probable cause based on interviews with other people, including German.

10.

Jacklitsch was dispatched to locate appellant and bring him back to the substation. At that point, it was law enforcement's intent to arrest appellant for murder. Jacklitsch went to appellant's residence and was told he was at a recycling center. Jacklitsch located appellant at approximately 1:00 p.m. at a local recycling center and detained him with handcuffs. Appellant was driven to the Los Banos substation, which took about 20 minutes.

Later that same day, appellant was interviewed again. Three detectives, Hale, Gibson and Barba, were involved. The second interview was recorded. The following exchange occurred at the very outset of the second recorded interview.

> "Gibson: ... Okay, I know that you wanted to talk to an attorney before, um at that time you were down here on your own free will basically just here for the D.N.A. sample....
>
> "[Appellant]: (Unintelligible) I talked to my grandma and she said, 'Bryan, why'd you do that, you make yourself look like you've done something . . .' And I was like, 'I'm sorry grandma I know I shouldn't but' so I listen to my grandma basically, sir. I ain't the very smartest person, I do have a very bad memory.
>
> "Hale: Okay.
>
> "[Appellant]: And what not. And I was listening to her. I listen to my grandma that's it. That's all I got you know.
>
> "Hale: Okay.
>
> "[Appellant]: So.
>
> "Hale: Well we're in here again um, things have changed now obviously.
>
> "[Appellant]: Okay.
>
> "Hale: Um, I will tell you, you're under arrest.
>
> "[Appellant]: Am I?
>
> "Hale: Yeah and I want to give you another opportunity um if you want to provide a statement.

11.

"[Appellant]: What am I under arrest . . .

"Hale: Okay.

"[Appellant]: For though [*sic*] sir?

"Hale: You're under arrest for murder.

"[Appellant]: For murder?

"Hale: Yeah, for murder. Actually two murders.

"[Appellant]: I'm under arrest for two murders?

"Hale: Yeah.

"[Appellant]: Why?

"Hale: Okay, you need to back up. Okay, you told me earlier that you wanted a lawyer.

"[Appellant]: Yeah.

"Hale: Okay.

"[Appellant]: Because I was scared about what was going on.

"Hale: Okay, but that's your right.

"[Appellant]: I didn't know what was going on dude.

"Hale: That's your right and so I can't ask you any more questions about that. That means our communication, once you tell me you want a lawyer, our communication has to stop. Okay since that time, okay things have changed.

"[Appellant]: Okay.

"Hale: I'm being straight up and honest with you. Okay, I'm not beating around the bush. I just told you, you're under arrest.

"[Appellant]: Okay.

"Hale: Okay and I am going to give you another opportunity to talk. Do you want to provide a statement?

"[Appellant]: I'll provide everything I know."

12.

Thereafter, appellant was read his *Miranda* rights, which he waived, and he agreed to talk. Appellant eventually admitted he shot both victims with the .22-caliber rifle and Delatorre used the shotgun.

### 2. The trial court's ruling.

Following argument by counsel, the trial court made several factual findings. It took judicial notice that appellant's interviews occurred on a Tuesday, which was a working day. It took judicial notice that the interviews occurred at the sheriff's substation, which is in a center containing the courthouse, the district attorney's offices, and the offices of the public defender. The court determined appellant was out of custody between the first and second interviews for a period no less than two hours and no more than three-and-a-half hours.

The court noted that this was not a lengthy break and it found *People v. Storm* (2002) 28 Cal.4th 1007 (*Storm*) to be instructive. The court stated the issue was whether appellant had had a reasonable opportunity to consult with counsel, and the court determined appellant made no effort to consult with counsel between interviews. The court did not find law enforcement used the break in custody to coerce appellant or to break him down. The court found the break's duration to be "minimally sufficient" for someone to contact counsel if they had wanted, but appellant chose not to do so and went about his daily life. The court denied appellant's motion to suppress, in part, because it determined a sufficient break in custody occurred.

The prosecutor briefly mentioned *Shatzer* during oral arguments, and *Shatzer* was cited in the prosecution's written opposition. However, during oral arguments, neither the trial court nor counsel discussed the scope of *Shatzer* or whether *Shatzer* demanded the granting of appellant's motion to suppress.

### B. Standard of review.

"An appellate court applies the independent or de novo standard of review, which by its nature is nondeferential, to a trial court's granting or denial of a motion to suppress

a statement under *Miranda* insofar as the trial court's underlying decision entails a measurement of the facts against the law. [Citations.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 730.) An appellate court "examines independently the resolution of a pure question of law; it scrutinizes for substantial evidence the resolution of a pure question of fact; it examines independently the resolution of a mixed question of law and fact that is predominantly legal; and it scrutinizes for substantial evidence the resolution of a mixed question of law and fact that is predominantly factual." (*Ibid.*)

The finding of whether a suspect initiated further communication with law enforcement is reviewed for substantial evidence. (*People v. Waidla, supra,* 22 Cal.4th at p. 731.)

### C.     Analysis.

Appellant asserts the trial court committed error when it relied upon *Storm, supra,* 28 Cal.4th 1007, and failed to apply *Shatzer, supra,* 559 U.S. 98. He argues the error was prejudicial, requiring reversal of his convictions and a remand for retrial.

#### 1.     The relevant case law.

Pursuant to *Miranda, supra,* 384 U.S. 436, a suspect who is subjected to custodial interrogation must be informed of his rights to remain silent and the presence of an attorney. If a suspect invokes his right to counsel, all further interrogation must cease until an attorney is present. (*Id.* at pp. 473-474.) Invoking the right to counsel under *Miranda* must be unambiguous and unequivocal. (*Davis v. United States* (1994) 512 U.S. 452, 459.)

In *Edwards v. Arizona* (1981) 451 U.S. 477 (*Edwards*), the high court held that once counsel is requested the suspect "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." (*Id.* at pp. 484-485.) Under *Edwards,* "[i]f further conversations are initiated by the police when there has not been a break in custody, the defendant's statements are presumed

14.

involuntary and inadmissible as substantive evidence at trial.  This is true even when the defendant again waives his *Miranda* rights and his statements are voluntary under traditional standards."  (*People v. Thomas* (2012) 54 Cal.4th 908, 926.)

The *Edwards* rule "is not offense specific."  (*McNeil v. Wisconsin* (1991) 501 U.S. 171, 177, italics omitted.)  "Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present."  (*Ibid.*, italics omitted.)  The purpose of the rule in *Edwards* is to preserve "'the integrity of an accused's choice to communicate with police only through counsel,' [citation], by 'prevent[ing] police from badgering a defendant into waiving his previously asserted *Miranda* rights,' [citation]."  (*Shatzer, supra,* 559 U.S. at p. 106.)  It "is not a constitutional mandate, but judicially prescribed prophylaxis."  (*Id.* at p. 105.)  Application of the *Edwards* rule "is 'justified only by reference to its prophylactic purpose'" and its presumption is not to be uncritically extended.  (*Id.* at p. 106.)  As the high court observed in *Shatzer,* "[t]he *Edwards* presumption of involuntariness is justified only in circumstances where the coercive pressures have increased so much that suspects' waivers of *Miranda* rights are likely to be involuntary most of the time."  (*Id.* at pp. 115-116.)

In *Storm, supra,* 28 Cal.4th 1007, our Supreme Court analyzed whether a break in custody vitiated the *Edwards* no-recontact rule.  In *Storm*, the defendant volunteered to undergo a polygraph test at the police station as part of an investigation into his wife's murder.  The defendant was given *Miranda* warnings, which were waived, but during the course of the test he invoked his right to counsel.  (*Storm, supra,* 28 Cal.4th at p. 1012.)  Rather than cease questioning, the polygraph operator encouraged the defendant to keep talking, and he admitted he killed his wife but claimed it was assisted suicide.  (*Ibid.*)  The defendant was allowed to leave the station but detectives came to his home two days later.  After assuring him no arrest would occur, the detectives interviewed the defendant again without new *Miranda* warnings.  The defendant gave a more detailed version of his

15.

wife's death.  The *Storm* court determined that the recognized "break-in-custody exception to the *Edwards* no-recontact rule" governed.  (*Ibid.*)  Following the break in custody, the defendant "had ample time, opportunity, and incentive to consult counsel outside the coercive atmosphere of custody."  (*Id.* at p. 1013.)  *Storm* upheld the admission of the later home interview into evidence, concluding the interview occurred in a noncustodial setting so that new *Miranda* warnings were not required.  (*Ibid.*)

*Storm* explained that, under the rule set forth in *Edwards, supra,* 451 U.S. 477, a suspect's statements to police are presumed involuntary and inadmissible once the right to counsel is invoked and the suspect's statements are then obtained in an encounter initiated by police without counsel present.  (*Storm, supra,* 28 Cal.4th at p. 1023.)  However, *Storm* held that *Edwards* is not violated when the police recontact a suspect after a break in custody so long as the suspect has a reasonable time and opportunity to consult counsel if desired.  (*Id.* at pp. 1024-1025.)  *Storm* determined that the two-day custodial break, occurring midweek, was "sufficient to dissipate custodial pressures and permit defendant to consult counsel."  (*Id.* at p. 1025, fn. omitted.)

In *Shatzer, supra,* 559 U.S. 98, the United States Supreme Court considered whether a break in custody ends the presumption of involuntariness set forth in *Edwards*.  In *Shatzer*, the defendant was incarcerated in prison pursuant to a prior conviction when he was questioned by a police detective about allegations he had sexually abused his son.  The defendant invoked his right to have counsel present and the detective terminated the interview.  The defendant was released back into the general prison population.  More than two years later another officer again initiated questioning about the sexual abuse.  The defendant waived renewed *Miranda* warnings and made inculpatory statements.  The trial court refused to suppress those statements, reasoning that *Edwards* did not apply because the defendant had experienced a break in *Miranda* custody prior to the second interrogation.  The Maryland Court of Appeals reversed.

16.

The *Shatzer* court noted that lower courts, including the California Supreme Court in *Storm, supra,* 28 Cal.4th at pages 1023-1024, had uniformly held that a break in custody ends the *Edwards* presumption of involuntariness. (*Shatzer, supra,* 559 U.S. at p. 105.) *Shatzer* endorsed this uniform approach, stating "[t]he only logical endpoint of *Edwards* disability is termination of *Miranda* custody and any of its lingering effects." (*Id.* at p. 108.) The Supreme Court noted law enforcement needed to know with certainty when a renewed interrogation is lawful after a suspect invokes his right to counsel. *Shatzer* held that a period of 14 days must pass, which "provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody." (*Id.* at p. 110.) *Shatzer* commented that the 14-day limitation avoided "gamesmanship" by law enforcement whereby a suspect could invoke his right to counsel, be released from custody briefly to end the *Edwards* presumption, and then be promptly brought back into custody for reinterrogation. (*Id.* at pp. 110-111.) Under its facts, *Shatzer* determined the defendant's return to the general prison population was a break in custody of sufficient duration to end the *Edwards* presumption so that suppression of his statements was not warranted. (*Id.* at p. 117.)

Here, appellant was handcuffed during his first interview with law enforcement. The trial court impliedly determined that appellant was in custody during his first interview, noting repeatedly that a break in custody occurred between the two interviews. Appellant's break in custody was far less than the 14 days required under *Shatzer, supra,* 559 U.S. at page 110. Consequently, appellant's second interview was conducted in violation of the *Edwards* rule, as interpreted by *Shatzer*, when the second interview occurred only hours after appellant invoked his right to counsel and was released from custody. (*Id.* at pp. 110-111.) Accordingly, all statements appellant made during the second interview were taken in violation of *Miranda* and *Edwards*, and should have been suppressed.

17.

Our reading and interpretation of *Shatzer* is consistent with sister tribunals. (See *United States v. Linder* (D.S.D. 2010) 759 F.Supp.2d 1133, 1143 [statements suppressed pursuant to *Shatzer* from second interrogation occurring three days after suspect invoked right to counsel and was released from custody]; *Commonwealth v. Thomas* (Mass. 2014) 469 Mass. 531, 548 [21 N.E.3d 901, 917] [defendant's statements during second police interview suppressed despite occurring before *Shatzer*'s publication after defendant invoked right to counsel and was released from custody for a few hours]; *State v. Wessells* (N.J. 2012) 209 N.J. 395, 409-413 [37 A.3d 1122, 1130-1132] [*Shatzer* given retroactive effect and found to be a bright-line rule resulting in inadmissibility of the defendant's statements after he invoked right to counsel and was reinterrogated following a nine-day break in custody]; *Coleman-Fuller v. State* (Md.Ct.App. 2010) 192 Md.App. 577, 604 [955 A.2d 985, 1001] [seven-day break in custody not sufficient under *Shatzer* resulting in reversal of conviction following admission of the defendant's statements during second interrogation].)

To fall outside the 14-day rule in *Shatzer*, respondent suggests appellant reinitiated communication with law enforcement. At the beginning of the second interview, appellant stated his grandmother told him he should not have invoked his right to an attorney, and he obeys his grandmother. Hale explained at the suppression hearing that he understood appellant's statement about his grandmother as an indication appellant wanted to speak further with the police. We disagree with this argument.

A suspect initiates dialogue with law enforcement when he or she speaks words or engages in conduct that can be "fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation." (*Oregon v. Bradshaw* (1983) 462 U.S. 1039, 1045 (plur. opn.).) If a suspect does initiate dialogue, the police may commence an interrogation if the suspect validly waives his rights. (*Id.* at p. 1046.)

Here, at the end of his first interview, appellant asked for an attorney and questioning ceased. Several hours later, a sheriff's deputy located appellant away from his home and informed him that Hale wished to speak with him further about the homicide investigation. Appellant was handcuffed, searched for weapons and transported back to the police station. This record does not establish that appellant initiated the second dialogue with police.

Appellant cites *Griffith v. Kentucky* (1987) 479 U.S. 314, 328 (*Griffith*) and contends the holding of *Shatzer* applies to his case even though the Supreme Court filed its opinion on February 24, 2010, approximately a month and a half after his January 12, 2010, interrogation. Respondent's opposition brief does not address the retroactive effect of *Shatzer*.

In *Griffith, supra,* 479 U.S. 314, the high court announced the rule of retroactivity. "[A] new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases, state or federal, pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past." (*Id.* at p. 328.)

Here, we agree with appellant that *Shatzer* applied to his case. At the time of his suppression hearing, *Shatzer* set forth a new rule for the conduct of criminal prosecutions. (*Griffith, supra,* 479 U.S. at p. 328.) Accordingly, the trial court was bound to apply *Shatzer* in resolving appellant's suppression motion. Because the trial court failed to apply *Shatzer*, we must address the prejudicial effect of this error.

**2.    The erroneous admission of the confession was prejudicial**.

Whenever a confession is erroneously admitted in a California trial, the prejudicial effect of the confession must be determined under the federal standard when the confession was obtained in violation of the federal Constitution. (*People v. Cahill* (1993) 5 Cal.4th 478, 509-510.) Under federal law, the test of prejudice for the erroneous admission of a confession is the standard set forth in *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Cunningham* (2001) 25 Cal.4th 926, 994; *People v.*

19.

*Johnson* (1993) 6 Cal.4th 1, 32-33.) The *Chapman* standard of review requires "the beneficiary of a constitutional error to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Chapman,* at p. 24.) Reversal is required if there is a "'reasonable possibility that the evidence complained of might have contributed to the conviction.'" (*Chapman,* at p. 23; *Yates v. Evatt* (1991) 500 U.S. 391, 402-403 (*Yates*), disapproved on another point in *Estelle v. McGuire* (1991) 502 U.S. 62, 72, fn. 4.)

"To say that an error did not 'contribute' to the ensuing verdict is not, of course, to say that the jury was totally unaware of that feature of the trial later held to have been erroneous." (*Yates, supra,* 500 U.S. at p. 403.) "To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record. Thus, to say that [the error] … did not contribute to the verdict is to make a judgment about the significance of the [error] to reasonable jurors, when measured against the other evidence considered by those jurors independently of the [error]." (*Id.* at pp. 403-404.) "[T]he appropriate inquiry is 'not whether, in a trial that occurred without the error, a guilty verdict would surely have been rendered, but whether the guilty verdict actually rendered in *this* trial was surely unattributable to the error.' (*Sullivan v. Louisiana* (1993) 508 U.S. 275, 279, italics original.)" (*People v. Quartermain* (1997) 16 Cal.4th 600, 621 [erroneous admission of defendant's statement was prejudicial]; accord, *People v. Neal* (2003) 31 Cal.4th 63, 86 [erroneous admission of defendant's confessions was prejudicial].)

"A confession is like no other evidence. Indeed, 'the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him .... The admissions of a defendant come from the actor himself, the most knowledgeable and unimpeachable source of information about his past conduct. Certainly, confessions have profound impact on the jury, so much so that we may justifiably doubt its ability to put them out of mind even if told to do so.' [Citation.]

20.

[Citation.] While some statements by a defendant may concern isolated aspects of the crime or may be incriminating only when linked to other evidence, a full confession in which the defendant discloses the motive for and means of the crime may tempt the jury to rely upon that evidence alone in reaching its decision." (*Arizona v. Fulminante* (1991) 499 U.S. 279, 296.)

Here, the record suggests the jury considered appellant's confession to be critical. The prosecutor opened his closing arguments with appellant's confession and argued appellant's own words established murder. The prosecutor referenced appellant's confession on approximately three additional occasions during his final arguments.

During deliberations, the jury sent two notes to the judge. The first note arrived approximately 78 minutes after deliberations started. The jury asked for the manuscripts of appellant's interviews and a computer to watch the videos. The court told the jury it would be allowed to watch the video in conjunction with the transcripts in the courtroom. The second note arrived approximately 33 minutes later, asking to watch the second interview with appellant and to read the transcript in the courtroom. The jury made no further requests after sending the second note, and it reached a verdict later that afternoon approximately two and half hours after sending the second note.

Based on this record, we cannot state that the guilty verdicts actually rendered in this trial were surely unattributable to the admission of appellant's confession. (*People v. Quartermain, supra,* 16 Cal.4th at p. 621; accord, *People v. Neal, supra,* 31 Cal.4th at p. 86.) Respondent, however, contends the remaining evidence against appellant was "overwhelming" so that the trial court's admission of appellant's confession was harmless beyond a reasonable doubt. Respondent points to the following four areas of evidence. We find these contentions unpersuasive.

### a. German's testimony.

Although German implicated appellant as one of the shooters, telling the jury that appellant admitted shooting the victims, the murder weapon was located in German's

21.

bedroom, and he testified under a use-immunity agreement signed on the morning of his testimony. German was originally booked on a charge of murder, but at the time of his trial testimony he was facing prosecution as an accessory after the fact. German gave numerous differing stories to police regarding how the rifle came into his possession. On cross-examination, German admitted he lied about everything he told the police because he did not want to tell them the truth "at all." He testified he did not want the officers to think he did the shooting.

Under CALCRIM No. 334, the jurors were instructed that, if they decided German was an accomplice, then they could not convict appellant of murder based on German's statement or testimony alone. The jury was instructed it could use German's statement or testimony to convict appellant only if it was supported by other evidence the jury believed was independent of German's statement or testimony and which tended to connect appellant to the commission of the crimes.

In closing arguments, the prosecutor stated it was "undisputed" that both German and appellant lied to the police. The prosecutor reminded the jury they were instructed about corroboration of an accomplice, and he asked the jury to treat German as if he were an accomplice. He argued that if German's testimony was taken "completely out of the case," appellant was still connected to the commission of the crime from his own confession. Because of that, the prosecutor argued the jury could consider German's testimony and use it to convict appellant.

This record demonstrates obvious credibility issues associated with German's testimony. In the absence of appellant's confession, it is not clear how much weight, if any, the jury would have given German. German's testimony is insufficient for us to say beyond a reasonable doubt that the admission of appellant's confession was harmless error.

22.

### b.     Appellant's jail calls.

While in jail, appellant spoke with a family member during two recorded phone calls. When told the police had no evidence against him, appellant said they did because they found the gun at German's house. When asked what he told police, appellant said German "snitched" and he (appellant) told police "it was me" and he "did it."

Respondent argues the jury would have still heard appellant's incriminating jail calls even if the confession was suppressed. Although these statements are incriminating, they fall short of a confession. Moreover, appellant said he felt pressured to make these statements to law enforcement because German was in the room with him and "they" were going to kill him if he did not. These recordings are not enough for us to say beyond a reasonable doubt that the admission of appellant's confession was harmless error.

### c.     The .22-caliber rifle.

Respondent contends there was "a multitude" of evidence linking appellant to the .22-caliber rifle which was involved in these homicides and which was located in German's bedroom. At trial, McEver identified appellant as a person who broke into his residence the day before these homicides, and he identified the same rifle as the weapon which appellant used. German testified appellant gave him the rifle after appellant became nervous following Mann's visit.

Although there was evidence linking appellant to this rifle, no forensic evidence established that appellant used this rifle during these homicides. As noted above, German's credibility was in doubt and the prosecutor argued the jury could use appellant's confession to give credibility to German's testimony. Although there is evidence tying appellant to the murder weapon, we cannot say that this evidence establishes beyond a reasonable doubt that the error was not prejudicial.

#### d. Appellant's "veiled reference" to the homicides.

Finally, respondent points to appellant's statements to Mann as a "veiled reference" to these homicides. When Mann visited appellant the day after the shootings, he asked if appellant knew why he was there. Appellant said yes, "because of the stuff that happened on the highway." Mann was surprised and explained he was there regarding stolen property. Appellant would not permit Mann to enter his residence even though Mann pleaded with him, reminding appellant that he had entered his residence before numerous times to provide medical aid for his grandmother.

Although this encounter suggests appellant was aware of the homicides, this evidence does not establish beyond a reasonable doubt that appellant participated in the shootings. Even when all of the evidence above is viewed cumulatively, we cannot say this evidence is sufficient to establish beyond a reasonable doubt that the error was not prejudicial.

Based on this record, reversal is required because there is a reasonable possibility appellant's erroneously admitted statements and confession after the first interview might have contributed to the convictions. (*Chapman, supra,* 386 U.S. at p. 23; *Yates, supra,* 500 U.S. at p. 403; *People v. Quartermain, supra,* 16 Cal.4th at p. 621.)

## II. The Scope of Retrial.[*]

Respondent argues the prosecutor should be permitted to again oppose the suppression of appellant's confession if a new trial is ordered. Respondent notes the prosecutor initially opposed appellant's suppression motion, in part, by arguing appellant was not in custody when he requested an attorney during his first interview with law enforcement on January 12, 2010. Respondent, however, admits that the prosecutor then conceded appellant was in custody during the first interview. Although the recording of

---

[*]    See footnote, *ante*, page 1.

appellant's first interview shows he was handcuffed, appellant contends the prosecutor's concession was done for unknown reasons.

Respondent asserts that, if appellant was not in custody at the time of the initial interview, he would have had no right to counsel under *Miranda*. Thus, appellant's invocation of his right to counsel was ineffective, rendering moot the 14-day protections under *Shatzer*. Respondent cites *People v. Mattson* (1990) 50 Cal.3d 826, 849 (*Mattson*) (superseded by statute on other grounds as noted in *People v. Jennings* (1991) 53 Cal.3d 334, 387, fn. 13), for the proposition prosecutors are allowed to argue new grounds and present new evidence during the retrial of cases, even regarding issues that were previously litigated. Accordingly, respondent maintains the trial court should not be precluded from reconsidering appellant's motion to suppress in light of any newly presented evidence and arguments by the prosecution.

Appellant objects to this request, contending the issue of whether appellant was in custody at the time of the initial interrogation was explored during the suppression hearing.

*Mattson, supra,* 50 Cal.3d 826 is the leading case analyzing the tension between the law-of-the-case doctrine and the scope of a new trial following the reversal of a judgment. "A reversal of a judgment without directions is an order for a new trial." (*Mattson, supra,* 50 Cal.3d at p. 849; § 1262.) When an appellate court orders an unqualified reversal, the parties are placed in the same position in the trial court as if the matter had never been tried. (*Mattson, supra,* at p. 849; § 1180.) Accusatory pleadings may be amended, in limine rulings are not binding, and pretrial motions and objections to the admission of evidence may be renewed and reconsidered. (*Mattson, supra,* at pp. 849-850.) In contrast, while the law-of-the-case doctrine binds the trial court as to the law, that doctrine controls the outcome "only if the evidence on retrial or rehearing of an issue is substantially the same as that upon which the appellate ruling was based." (*Id.* at p. 850.)

The law-of-the-case doctrine does not preclude the introduction of new evidence on suppression issues when an appellate court reverses a conviction and sets the matter for a new trial. (*People v. Boyer* (2006) 38 Cal.4th 412, 442; *Mattson, supra,* 50 Cal.3d at p. 850; *People v. Anderson* (2008) 169 Cal.App.4th 321, 333 (*Anderson*) [a renewed suppression motion may be brought following an appellate court's ruling on suppression issues].) To relitigate a suppression motion dealing with the Fifth or Sixth Amendments, a party must offer "new or different" evidence from that which was considered by the original trial court. (*Mattson, supra,* 50 Cal.3d at pp. 851-852; *Anderson, supra,* 169 Cal.App.4th at p. 333.) If new or different evidence is not presented, the trial court must follow the appellate court's ruling. If such evidence is presented, the trial court must redetermine the suppression motion. (*Anderson, supra,* at p. 333.)

In this context, "new or different" evidence, regardless of its significance, does not automatically relieve the trial court of its obligation to follow the prior appellate ruling. (*Anderson, supra,* 169 Cal.App.4th at p. 333.) Such a result would render the law-of-the-case doctrine irrelevant. To trigger a redetermination, the evidence offered on remand must be at least potentially sufficient to result in a different outcome of the suppression motion. (*Ibid.*) Evidence is "new or different" in this context if it either raises material factual or legal issues not considered by the first trial judge, or it creates a realistic possibility that the judge's factual findings were in error. In the absence of such evidence, the evidence before the remand court will be substantially the same, and the remand court must follow the appellate court's ruling. (*Mattson, supra*, 50 Cal.3d at pp. 850, 853.) On the other hand, if such new or different evidence has been presented, the trial court must redetermine the motion by rendering a ruling independent of the original trial court ruling. (*Anderson, supra,* 169 Cal.App.4th at pp. 333-334.)

Here, we agree with respondent that the trial court is not precluded from reconsidering appellant's suppression motion on remand so long as the prosecution offers "new or different" evidence from the evidence considered by the original trial court.

(*Mattson, supra,* 50 Cal.3d at p. 853; *Anderson, supra,* 169 Cal.App.4th at pp. 333-334.) In either event, the court is to proceed consistently with the above authorities.

## III. Appellant's Statements Were Not The Result Of Police Coercion.[*]

In an alternative argument, appellant asserts that his *Miranda* waivers and statements during the second interrogation were coerced when the totality of the circumstances are examined. Although we reverse the judgment for the trial court's failure to apply *Shatzer*, we address this alternative claim to assist the parties on remand in the event a new record is developed that would render *Shatzer* inapplicable.

### A. Background.

#### 1. Appellant's second interrogation.

After appellant was read, and waived, his *Miranda* rights during the second interrogation, he denied knowing anything about the two murders. He explained he went to Walmart with German, who bought him a flashlight and knife. Delatorre and another "dude" also went, but appellant did not know them. They left, went to a grocery store, and German dropped appellant off at home. Delatorre was dropped off somewhere in Los Banos, and he did not know where German dropped off "the other guy."

Appellant was told law enforcement had recovered a gun that day. When asked if his fingerprints would be on it, appellant said, "Probably not." The detectives suggested that appellant had the gun at his residence but gave it to somebody to hold after Mann came to his house. Appellant said it sounded like somebody was "playing" them "pretty good." Appellant continued to deny any knowledge of the murders, denied being a gang member, and denied knowing whether the others were gang members.

A polygraph test was suggested to appellant, who agreed to it. Appellant again denied any knowledge of the murders but asked where his lawyer was, noting he was under arrest. He said he wanted to ask his lawyer if he should take the polygraph test.

---

[*] See footnote, *ante*, page 1.

27.

The interview was suspended. Barba told appellant they could not talk further because he asked for a lawyer. Appellant asked to speak with Hale and the interview continued.

Appellant said the gun was dropped off at his residence by someone he neither recognized nor knew, but he later admitted he had seen this person several times. He said it was German who had called him saying they had something to drop off. Appellant said he called German to pick up the gun after Mann came to his residence. Appellant expressed concern his DNA would be on the weapon. Appellant later changed his story and said it was German who dropped off the gun and then picked it up. Appellant continued to deny knowing the shooter.

During this exchange, appellant said he was in fear for his life and he asked several times if "they" would come after him. Barba noted appellant had a "legitimate" concern and people might come after him. Appellant was told he needed to tell the truth and then the detectives could tell him what they could do for him.

Appellant asked Barba what would happen if he identified the shooters, indicating he did not want to be around the area if he did. Appellant was told to tell the truth and then the detectives could say what they could do for him. Barba said they could help appellant's elderly grandmother, noting appellant's friends would not give her insulin. A short time later appellant said "they" were going to come after him and his family if he said something. Appellant asked about witness protection and said he did not want to "do this." Barba continued to tell appellant to tell the truth, reminding appellant he had put himself into this mess with friends who would not help him. Appellant asked if people went out-of-state for witness protection. Barba said some people had gone out-of-state, and he asked if appellant was ready to speak with Hale again. Appellant said he was ready and asked if "they" would find out he talked. Barba said there was "a lot of finger pointing."

Hale asked appellant if he wanted to talk and appellant said he wanted to make sure he was protected. Hale said appellant had wanted a lawyer "a couple of times" and

28.

he had waived his rights twice.  Hale asked appellant if he wanted to give a statement which would be "free and voluntary."  Appellant answered affirmatively and denied being threatened or mistreated.  Appellant said he wanted to "make sure" about witness protection.  Hale said they had "places" and "all kinds of things that are available."  Hale told appellant he needed to tell his story before he would talk about witness protection.

Appellant said it was German and Delatorre who dropped off the gun, and Delatorre said he shot both victims.  Appellant asked the detectives if anyone could hear him because he was scared.  Appellant then said German and Delatorre told him they had already gotten rid of the shotgun.  Appellant became nervous when Mann came to his house and he called German, who said he would collect the rifle.  Appellant put the rifle in a pillow case and walked it out to German's car, and German put it in his trunk.

A little later, appellant was told he was going to jail.  Appellant asked why, noting he had said everything he knew.  Appellant said he needed to get to his family, and he continued to express concern that someone might hurt his family.  Hale said it sounded like appellant thought he was going to avoid jail because he gave a story to the detectives.

Appellant was asked if a stolen vehicle was involved, but appellant said he did not know.  Appellant was asked if he was sure because law enforcement had information regarding a stolen vehicle.  Appellant admitted he had been lying.  He said a white stolen vehicle was involved and he was at the scene of the shooting.  He said German drove and he, along with Delatorre and some "other homie" whom appellant did not know, got out of the stolen vehicle.  Delatorre had the shotgun and the other individual had the rifle.  Appellant claimed he did not enter the garage but the other two went inside and appellant heard shots.  Appellant said it was the idea of the other three to do a home invasion robbery and Delatorre brought both weapons.  After the shootings they drove to the residence of Delatorre's girlfriend and spent the night there in Los Banos.  He was dropped off at home around 6:00 or 7:00 the next morning.  The detectives, however, told

appellant that they did not believe his story because this was the first they had heard about a "fourth guy" being involved.

According to German, no fourth guy was involved. The detectives asked appellant if German should come into the room so they could "hash" it out. Appellant said there was a fourth guy involved and they should bring in German. Appellant then said no fourth guy was involved, and Delatorre did the shooting with someone else whom appellant did not know. Appellant asked if he was going to jail for life and asked what German was saying. Appellant then changed his story again and said a fourth guy was involved, but he did not know his identity. He continued to deny being a shooter.

The detectives placed German in the room with appellant, telling them they were both involved and they needed to figure it out. After the detectives left them alone, appellant and German speculated about who was providing information to law enforcement. Appellant said law enforcement could not do anything if they kept bending the truth. German said law enforcement had the murder weapon. Appellant responded, "Dumb move. We should have gotten rid of that." German later suggested they could "come straight with them right now." German noted law enforcement had the pieces and they could cut a deal. German said, "They found a gun at my house. They know you did it, they know [Delatorre] did it." Shortly thereafter the detectives returned. Appellant and German were alone for approximately six minutes.

German remained in the room after the detectives returned. Appellant asked how much time he was facing. Hale said it depended on the degree of murder, but he believed premeditation could be established. He told appellant the prosecution would go harder on someone who was lying or hiding facts. Appellant asked if it was possible to see his family one last time and then said, "Never mind." Appellant was asked what happened and told maybe something could be worked out later. Appellant said he and Delatorre were the shooters. Appellant admitted shooting both victims with the .22-caliber rifle. They drove to the victims' residence in the white SUV, and both Delatorre and appellant

30.

entered the garage at the same time. Delatorre used the shotgun. After the shooting they drove to Los Banos and spent the night. German picked them up the next morning and appellant gave the rifle to German after Mann came to his residence. Appellant denied being involved in the home invasion of McEver's residence.

Following his conversation with German, appellant's confession occurred approximately three minutes after the detectives returned to the room.

### 2. The trial court's ruling regarding the second interrogation.

After determining a sufficient break in custody occurred between interrogations, the court then examined the legality of the second interrogation. It determined, under "the totality of everything that took place," that appellant initiated the discussion of leniency, and appellant effectively deflected and sparred with the detectives. The court found that appellant reinitiated many of the conversations with law enforcement after the first interview. Regarding the polygraph test, the court determined appellant asked for a lawyer about whether it was advisable to take the test, and there was no evidence that appellant was requesting a lawyer "for all purposes like he had earlier in the day." It was noted appellant knew the interrogation would stop if he requested an attorney.

As part of the suppression motion, appellant had attached a report from a forensic psychiatrist that called into question appellant's level of intelligence. The court determined that the evidence from the suppression hearing did not suggest appellant had a low intelligence. It did not find a *Miranda* violation regarding the second interview. No promises were made to appellant that would render his ultimate confession involuntary. The court found no intimidation or fear placed upon appellant sufficient to find an involuntary confession once German was placed in the interview room with appellant. Based on these findings, the court denied appellant's suppression motion.

### B. Standard of review.

Both the state and federal Constitutions prohibit the introduction of a defendant's involuntary confession into evidence at trial. (*People v. Linton* (2013) 56 Cal.4th 1146,

1176 (*Linton*).)  To determine whether a confession is voluntary, courts examine the totality of the circumstances, including the defendant's characteristics and the interrogation's details.  (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 226 (*Bustamonte*); *People v. Massie* (1998) 19 Cal.4th 550, 576 (*Massie*).)  Regarding the defendant, the court takes into account his or her age, level of education, level of intelligence, physical condition, mental health, and whether he or she received advice regarding constitutional rights.  (*Bustamonte, supra,* 412 U.S. at p. 226; *Massie, supra,* 19 Cal.4th at p. 576.)  Regarding the interrogation, the court examines its location, its duration, whether questioning was repeated and prolonged, and whether any physical punishment occurred.  (*Bustamonte, supra,* 412 U.S. at p. 226; *Massie, supra,* 19 Cal.4th at p. 576.)

A confession may be deemed involuntary when it was the result of threats, violence, direct or implied promises, or improper influence.  (*Linton, supra,* 56 Cal.4th at p. 1176.)  Coercive police activity is a necessary predicate to establish an involuntary confession.  However, such a finding, without more, does not render a resulting confession involuntary.  Instead, the defendant's statement must be causally linked to any inducement.  To be involuntary, coercive police activity must be the motivating cause of the defendant's confession.  (*Ibid.*)

Once a proper advisement of constitutional rights are given, the defendant may be freely questioned so long as threats of harm or false promises of benefits are not given.  (*People v. Carrington* (2009) 47 Cal.4th 145, 170.)  Law enforcement may exchange information with the defendant, summarize evidence, outline a theory of events, confront the defendant with contradictory facts, and enter into a debate.  However, the defendant can neither receive threats of punishment for a failure to admit or confess particular facts, nor receive false promises of leniency as a reward for any admission or confession.  (*Ibid.*)

The prosecution bears the burden to establish by a preponderance of the evidence that a defendant's confession was voluntary. (*Linton, supra,* 56 Cal.4th at p. 1176.) If the interview was recorded, the facts surrounding the defendant's statements are undisputed and subject to independent review by the appellate court. (*Id.* at p. 1177.)

## C.    Analysis.

Appellant argues he presented evidence of his low intelligence at the suppression hearing and the coercive impact of the detectives' statements must be evaluated in the context of his low intelligence. He contends he repeatedly expressed concern for his life and maintains that, because of his low intelligence, he believed a promise of witness protection was made to him even though a person with more intelligence would likely have realized no such promise was made. He asserts the trial court failed to correctly apply the "totality of the circumstances" test because the court used a "reasonable man" standard rather than the subjective test mandated by the United States Supreme Court. He claims all of his statements made to law enforcement after Hale responded to a question about witness protection should have been suppressed. We disagree.

This record demonstrates that the discussion of witness protection was neither coercive, even when considering the evidence of appellant's low intelligence, nor was it causally related to appellant's confession. After witness protection was discussed, appellant continued to give differing accounts of what happened. He told the detectives it was German and Delatorre who dropped off the rifle, and he continued to deny knowing the identity of the shooters. Upon further questioning, appellant admitted he had been lying about the white stolen vehicle. Appellant said he was present at the scene of the murders but Delatorre and some other individual did the shootings. The detectives said they did not believe his story. The interrogation was stopped.

After witness protection was mentioned, appellant continued to provide false and conflicting information. Appellant's actions do not demonstrate a person who was no longer capable of offering resistance and the record does not demonstrate that his will

33.

was overborne. To the contrary, appellant continued to demonstrate an ability to calculate what information he would disclose or withhold.

Moreover, appellant did not provide a confession based on a promise of witness protection. No such promise was made or implied. Instead, the recorded events establish that appellant's confession was motivated by his discussion with German, who told him they should make a deal, and law enforcement knew both appellant and Delatorre committed the murders. Appellant confessed approximately three minutes after detectives returned. Coercive police activity was not the motivating cause of appellant's confession. (*Linton, supra,* 56 Cal.4th at p. 1176.) Accordingly, the trial court did not err in determining appellant's confessions were made without reliance of any promises by law enforcement.

## IV.     Evidence Of The Surreptitiously Recorded Conversation With German.[*]

Appellant asserts that the surreptitiously recorded conversation he had with German should have been suppressed under the "fruit of the poisonous tree" doctrine. He contends his recorded conversation with German was "part and parcel" of the ongoing interrogation in which the detectives induced him to make admissions and confessions by "improperly leading him to believe police would provide witness protection for [him] if he cooperated with them." This contention is unpersuasive.

Under the "fruit of the poisonous tree" doctrine, the appellate court first examines whether a "primary illegality" occurred. (*Wong Sun v. United States* (1963) 371 U.S. 471, 488.) If so, the next question is whether the disputed evidence was the result of an exploitation of that illegality by law enforcement. If so, the disputed evidence may not be used against the defendant. (*Ibid.*)

Here, as discussed above, the trial court properly determined no coercion occurred. Accordingly, although appellant's recorded statements to German were inadmissible

---

*        See footnote, *ante*, page 1.

under *Shatzer*, they were not made inadmissible as "fruit of the poisonous tree" based on alleged promises of witness protection.

## V.     The Trial Court's Error Regarding CALCRIM No. 301.[*]

During trial, Dr. Ann Bucholtz testified for the prosecution as a forensic pathologist. Shandra Kensey testified for the prosecution as a gang expert. Dr. Bobby Tehrani testified for the defense as a clinical psychologist.

When instructing the jury, the court said the following using a modified version of CALCRIM No. 301: "Neither side is required to call all of the witnesses who may have information about the case or to produce all physical evidence that might be relevant. Except for the testimony of Dr. Ann Bucholtz, Dr. Bobby Tehrani, Officer Shane Kensey and Jose German, if you decide he is an accomplice, which requires supporting evidence, the testimony of only one witness can prove any fact."

Appellant asserts the trial court erred when it instructed the jury that testimony of Dr. Tehrani was not sufficient, standing alone, to establish the truth of any fact. Respondent concedes error occurred but argues no prejudice resulted.

As respondent points out, the testimony of one witness is generally sufficient "for proof of any fact" unless "additional evidence is required by statute." (Evid. Code, § 411.) However, corroborating evidence is required for the testimony of accomplices (Pen. Code, § 1111) and an "in-custody informant" (Pen. Code, § 1111.5). Corroboration is also required for the conviction of certain crimes: treason (Cal. Const. art. I, § 18); solicitation (Pen. Code, § 653f, subd. (f)); perjury (Pen. Code, § 118, subd. (b)); obtaining property by false pretenses (Pen. Code, § 532, subd. (b)); and abortion and seduction of a minor (Pen. Code, § 1108).

We agree with the parties that the trial court erred when it instructed the jury that Dr. Tehrani's testimony (along with Dr. Bucholtz and Officer Kensey) required

---

[*]     See footnote, *ante*, page 1.

corroboration, or was otherwise insufficient standing alone, to prove a fact. This record does not demonstrate that the testimony of these witnesses required additional corroboration.

The parties disagree on whether the analysis of prejudice should occur under the federal standard of *Chapman, supra,* 386 U.S. at page 24, or the state standard of *People v. Watson* (1956) 46 Cal.2d 818, 836. The parties also disagree whether this error violated appellant's Sixth Amendment right to present a defense. We need not resolve these disputes because we are reversing the judgment and remanding for a new trial under the grounds set forth in part I of the Discussion, *ante*. Upon retrial, the trial court shall provide a jury instruction under CALCRIM No. 301 omitting the name of any witness who does not require corroborating evidence to prove a fact.

## VI.  The Trial Court Committed Error In Not Giving An Instruction On The Firearm Enhancement.[*]

As to both counts of murder, the prosecution alleged that appellant personally and intentionally discharged a firearm causing death. However, the trial court failed to instruct the jury regarding the firearm enhancements. After the jury returned guilty verdicts on all counts and found true all allegations, the trial court recognized its mistake and invited the parties to submit comments and briefing. At the sentencing hearing, the trial court found that its omission was not prejudicial.

"In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case. [Citation.]" (*People v. Martinez* (2010) 47 Cal.4th 911, 953.)

We agree with the parties that the trial court erred when it failed to instruct the jury regarding the firearm enhancements. Although the parties agree that error occurred,

---

[*]      See footnote, *ante*, page 1.

they disagree regarding which CALCRIM instruction should have been provided, (Nos. 3149 or 3150), and whether the error was prejudicial.  We need not address those disputes because we are reversing the judgment and remanding for a new trial under the grounds set forth in part I, *ante*.  Upon retrial, the trial court shall determine and provide the appropriate jury instruction regarding the charged firearm enhancements based on the operative pleading.[3]

## DISPOSITION

The judgment is reversed.  The matter is remanded to the trial court for further proceedings consistent with this opinion.

_____

LEVY, Acting P.J.

WE CONCUR:


_____

KANE, J.


_____

DETJEN, J.

---

[3]    Because we reverse for a new trial, we do not address appellant's final contention that the cumulative effect of the errors committed at trial violated his rights to due process of law under the Fourteenth Amendment.