Filed 11/19/24  P. v. Ramos CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | B330371 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. GA111946) |
| v. | |
| ANGEL ALEXIS RAMOS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Suzette Clover, Judge.  Affirmed.

Jennifer Peabody, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Kenneth C. Byrne and Charles Chung, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

In an information filed by the Los Angeles County District Attorney's Office, defendant and appellant Angel Alexis Ramos was charged with possession for sale of a controlled substance. (Health & Saf. Code, § 11351.)  It was further alleged that the offense involved a large quantity of contraband as defined by California Rules of Court, rule 4.421(a)(10).

Following a court trial, defendant was found guilty as charged and sentenced to the low term of two years in county jail.

Defendant timely filed a notice of appeal.  He argues that (1) the trial court did not adequately advise him when he waived his right to a jury trial, and (2) the trial court should have suppressed certain statements made to the police.  (*Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*).)

We affirm.

## FACTUAL BACKGROUND

On August 3, 2021, six Glendale Police Department officers executed a search warrant for room 302 at a Travelodge motel. Officers had followed an unidentified male from a "controlled buy" to that room of the motel.  The officers knocked on the door and identified themselves as law enforcement.  They saw movement inside the room through the peephole and tried to open the door with a keycard.  After approximately one minute, the officers opened the door to the room and found three men lying on the floor.  Defendant was lying closest to the bathroom. Officers ordered the men to exit and proceeded to search the room.

The toilet was running in the bathroom and, in the bottom of the toilet bowl, officers discovered a pile of blue fentanyl pills. A suitcase sat atop the bed closest to the entry door.  Inside the suitcase was clothing, fentanyl in pill and powder form, black tar heroin, methamphetamine, $8,600 in cash, and two cell phones among other items.  Under that bed were multiple baggies of methamphetamine and black tar heroin as well as fentanyl.

2

On a nightstand beside the bed, officers found a wallet with $554 in cash and a baggie with blue fentanyl pills. A cell phone was on the table in the living area of the room. By the window overlooking the parking lot was a suitcase with handwritten "pay-and-owe sheets" listing sales transactions as well as packaging material with custom symbols on them.

Police also searched two cars in the motel parking lot—a Honda and a Mazda. There was no evidence found in the Honda. But inside the Mazda, police found baggies, a scale, and a motel receipt for a Travelodge motel at another location.

Detectives questioned each of the three men to attempt to determine who owned the items found in the motel room. Defendant acknowledged that clothing from the suitcase, the cash, and the wallet belonged to him. He denied that any of the drugs belonged to him.

Police later arrested the three men and took them to the police department jail. Detectives spoke with defendant in an interview room at the prebooking area of the jail. Defendant said that he had been in the motel for a couple days. He again denied that any of the drugs in the motel room belonged to him but, at this interview, defendant acknowledged seeing the drugs in his suitcase previously; he claimed that the blue pills in the wallet belonged to his girlfriend. Defendant also told police that the cellphone on the living room table was his and that there might be text messages with his girlfriend about buying drugs for her. Defendant said that he never used drugs except for marijuana and that the Honda in the parking lot was his car.

Detective Dylan Montes testified to his opinion that the drugs discovered in the motel room were possessed for the purpose of sale. He based this opinion on "the variety of narcotics, the amount of narcotics located, the amount of cash found, digital scales, packaging, and pay-and-owe sheets."

The drugs were tested to be 51.3 grams of white solid substance containing fentanyl, 25.05 grams of powder and solid substance containing fentanyl, fentanyl tablets, 24.19 grams of crystalline solid substance and powder containing methamphetamine, 1.99 grams of crystalline solid substance and powder containing methamphetamine, and a total of 45.85 grams of solid substance containing heroin.

## DISCUSSION

I. *Defendant's waiver of his right to a jury trial*

Defendant contends that he did not make a knowing, intelligent, and voluntary waiver of his right to a trial by jury because the trial court's waiver colloquy was constitutionally deficient.

A. <u>Relevant background</u>

On February 14, 2023, after defense counsel filed a motion to suppress evidence, the parties discussed waiving a jury trial; defense counsel informed the prosecution that she had discussed the waiver with defendant. The trial court delayed addressing the jury waiver issue at defense counsel's request.

On March 9, 2023, the parties informed the trial court of their intent to waive a jury trial, and the following colloquy ensued:

"[The Court]: My understanding is that Mr. Ramos and the People are going to both waive the right to a jury trial; is that right?

"[Defense counsel]: That's correct.

"[Prosecutor]: That's correct, your Honor.

"[The Court]: Ms. Young [the prosecutor], would you please advise him and take the jury trial waiver from Mr. Ramos.

"[Prosecutor]: Thank you, your honor. [¶] Mr. Ramos, good morning. You have the right to a jury trial where 12 members of the community would be asked to sit in judgment of

4

your case.  [¶]  During that jury trial you would have the right to confront and cross-examine witnesses, the right to use the free subpoena power of the court at no cost to you; the right to testify on your behalf if you chose to; conversely, you would have the right not to testify, which is known as the privilege against self-incrimination.  [¶]  Do you understand those rights and waive and give up your right to have a trial by jury?

"[Defendant]:  Yes.

"[The Court]:  And, counsel, do you join?

"[The Defendant]:  Yes.

"[Prosecutor]:  People join in the jury waiver.

"[The Court]:  Okay.  The court is going to find that Mr. Ramos has made a knowing, intelligent, and voluntary waiver of his right to a jury trial in this case.  [¶]  And the People also join in that jury trial waiver."

B.  Relevant law

Under the federal Constitution and our state Constitution, a criminal defendant has a right to a jury trial.  (*People v. Sivongxxay* (2017) 3 Cal.5th 151, 166 (*Sivongxxay*).)  Waiver of this right is permitted under both Constitutions.  (*Duncan v. Louisiana* (1968) 391 U.S. 145, 158; Cal. Const., art. I, § 16.)  However, in a criminal case, such waiver is permitted only with "the consent of both parties expressed in open court by the defendant and the defendant's counsel."  (Cal. Const., art. I, § 16; *People v. Morelos* (2022) 13 Cal.5th 722, 753 (*Morelos*).)

"To be valid, a defendant's waiver of the right to a jury must . . . be 'knowing and intelligent, that is, ""made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."""'"  (*People v. Weaver* (2012) 53 Cal.4th 1056, 1071–1072 (*Weaver*); *People v. Collins* (2001) 26 Cal.4th 297, 305.)  "'[W]hether or not there is an intelligent, competent, self-protecting waiver of jury trial by an

accused must depend upon the unique circumstances of each case.'" (*Sivongxxay*, *supra*, 3 Cal.5th at p. 166.)

The California Supreme Court has offered "some general guidance to help ensure that a defendant's jury trial waiver is knowing and intelligent, and to facilitate the resolution of a challenge to a jury waiver on appeal. [The court] recommend[ed] that trial courts advise a defendant of the basic mechanics of a jury trial in a waiver colloquy, including but not necessarily limited to the facts that (1) a jury is made up of 12 members of the community; (2) a defendant through his or her counsel may participate in jury selection; (3) all 12 jurors must unanimously agree in order to render a verdict; and (4) if a defendant waives the right to a jury trial, a judge alone will decide his or her guilt or innocence. . . . [T]he trial judge [should] take additional steps as appropriate to ensure, on the record, that the defendant comprehends what the jury trial right entails [such as] by asking the defendant directly if he or she understands or has any questions about the right being waived." (*Sivongxxay*, *supra*, 3 Cal.5th at pp. 169–170.) The recommended colloquy is advisory, and "not intended to limit trial courts to a narrow or rigid colloquy." (*Id*. at p. 170.)

In other words, "a trial court's adaptation of or departure from the recommended colloquy in an individual case will not necessarily render an ensuing jury waiver invalid." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 170.) Indeed, there is "no duty on the trial court to inquire into the waiver of a jury trial by defendant unless the trial judge had some reason . . . to think that defendant did not understand the nature of the waiver." (*People v. Langdon* (1959) 52 Cal.2d 425, 432–433; see also *People v. Lookadoo* (1967) 66 Cal.2d 307, 311.)

We review the totality of the circumstances to determine if a defendant validly waived his right to a jury trial. (*Sivongxxay*,

*supra*, 3 Cal.5th at pp. 166–167.)  Factors evidencing the knowing and voluntary nature of such a waiver include: (1) the assistance of counsel, (2) whether the defendant initiated the request for a court trial, (3) the advisements given, (4) the defendant's response to the advisements, and (5) the defendant's prior experience with the criminal justice system.  (*Id*. at pp. 167–168.)  Our review is de novo.  (*People v. Vargas* (1993) 13 Cal.App.4th 1653, 1660.)

C.  <u>Analysis</u>

Here, the totality of the circumstances "establish[es] a sound and 'affirmative[]' basis [citation] to conclude" that defendant knowingly and intelligently waived his right to a jury trial.  (*Morelos*, *supra*, 13 Cal.5th at p. 759.)  Defendant had plenty of time to contemplate a waiver, at least from February 14, 2023, when it was first mentioned on the record, until the March 9, 2023, waiver.  Also, he had assistance of counsel and a translator, and the parties initiated the waiver request.  The prosecution advised defendant that a jury consists of 12 members of the community and that during a jury trial, he would have the right to confront and cross-examine witnesses, to issue subpoenas at no cost to him, and to choose whether to testify.  When asked if he understood his rights and wished to waive and give up his right to a jury trial, he answered, "Yes."  That the advisement did not track all of *Sivongxxay*'s advisory recommendations does not, as defendant contends, render his waiver unconstitutionally deficient as a matter of law.  "Viewed holistically," defendant's waiver was knowing, intelligent, and voluntary.  (*Sivongxxay*, *supra*, 3 Cal.5th at p. 168; see also *Morelos*, *supra*, 13 Cal.5th at pp. 756–758.)

Urging us to reverse, defendant argues that there is insufficient affirmative evidence that his waiver was knowing and intelligent.  He asserts that there is no record of discussions

7

with defense counsel about the waiver, there was no written jury waiver as in *Weaver*, *supra*, 53 Cal.4th 1056, and the trial court made no follow-up inquiries as was done in *Morelos*. We are not convinced.

As set forth above, the record confirms that defense counsel discussed the jury waiver with defendant. (See *People v. Daniels* (2017) 3 Cal.5th 961, 996–997 (conc. & dis. opn. of Cuéllar, J.) [within the totality of relevant circumstances assessment is the fact of representation by counsel and references to discussions between counsel and defendant].) In fact, the parties were ready to address the jury waiver at least as early as February 14, 2023.

Furthermore, case law does not support defendant's proposition that a trial court *must* provide a written, signed waiver. While the defendant in *Weaver* did have a signed waiver, it was not dispositive of the issue in that case. Thus, the Supreme Court turned to the trial court's verbal advisements to evaluate the validity of the defendant's jury waiver. (*Weaver*, *supra*, 53 Cal.4th at p. 1074.) In other words, while a signed waiver may be helpful to a reviewing court, *Weaver* does not hold that a signed waiver is required in every case to document a jury waiver. So long as the record demonstrates that the defendant was aware of his waiver, which he was in this case, the waiver stands.

Finally, we reject defendant's contention that the trial court must conduct a follow-up inquiry during a waiver colloquy. At the risk of sounding redundant, so long as the totality of the circumstances demonstrates that defendant understood the scope of his waiver, the waiver stands.

*Morelos* does not hold otherwise. In that case, there was good reason for the trial court to ask multiple follow-up questions regarding a waiver: The defendant was representing himself and sought to waive a jury for both the guilt and penalty phases of

8

trial. (*Morelos*, *supra*, 13 Cal.5th at p. 753.) Under those circumstances, the trial court appropriately followed through with *Sivongxxay*'s recommendation to "take additional steps as appropriate to ensure, on the record, that the defendant comprehends what the jury trial right entails." (*Sivongxxay*, *supra*, 3 Cal.5th at p. 169.) Those circumstances are simply not present in the instant case.

Defendant's reliance upon *People v. Jones* (2018) 26 Cal.App.5th 420 (*Jones*) and *People v. Blancett* (2017) 15 Cal.App.5th 1200 (*Blancett*) is misplaced.

In *Jones*, the prosecutor took a jury waiver from the defendant without explaining any mechanics of a jury trial. (*Jones*, *supra*, 26 Cal.App.5th at p. 428.) "Nothing in the record suggest[ed] that [the defendant] was aware that a jury is comprised of individuals drawn from the community," and "the trial court did not advise [the defendant] as to the specific rights she would be giving up or inquire if her attorney explained those rights to her[.]" (*Ibid*.)

Similarly, in *Blancett*, the colloquy regarding waiver of the right to a jury trial was "barebones." (*Blancett*, *supra*, 15 Cal.App.5th at p. 1206.) It was unclear from the record whether the defendant had even the fundamental awareness "that he was entitled to a jury trial." (*Ibid*.)

Here, in contrast, the record shows that defense counsel discussed the waiver with defendant (*People v. Daniels*, *supra*, 3 Cal.5th at p. 999 (conc. & dis. opn. of Cuéllar, J.) ["Courts generally rely on counsel to transmit to defendants critical information about whether to waive the jury trial right and the consequences of waiving it"]), and the waiver colloquy included advisements as to the basic mechanics of a jury trial. Moreover, defendant's decision was not hastily made with the help of newly appointed counsel. Rather, defense counsel had represented

9

defendant at least since the preliminary hearing three months earlier, he discussed the waiver with defense counsel, and he was advised of the basic mechanics of jury trial before entering his waiver. In short, the trial court had no reason to suspect that defendant misunderstood his rights or the consequences of his waiver.

II. *Admission into evidence of statements made by defendant before he was given his <u>Miranda</u> warnings*

Defendant argues that the trial court erred by admitting his statements to the police at the motel because the statements were obtained in violation of *Miranda*.

A. <u>Relevant proceedings</u>

1. *Defendant's conversation with detectives at the motel*

At approximately 1:36 p.m., Detective Montes questioned defendant in the hallway outside of the motel room with Detective Ivan Cornejo assisting as a translator. The interview later continued inside the motel room. Detective Cornejo recorded the interview with a department-issued body-worn camera, and a transcript with translations was admitted at trial.

Defendant's handcuffs were removed. Detective Montes testified that he "asked Detective Cornejo to remove the handcuffs" because defendant "was not under arrest at that time, and I wanted the chance to speak with him." The prosecution asked, "You made the decision not to *Mirandize* him before you spoke to him," and the detective answered, "Correct." When asked why, Detective Montes explained, "Again, he was just detained at that time. So I wanted—my goal was to attempt to identify whose belongings were whose and what role each person had in the room."

Defendant provided his name and birthdate, and then stated that the suitcase on the bed and the wallet on the

10

nightstand belonged to him.  He came to the United States nine months ago, and had been in the motel room for two or three days, but would usually stay at his girlfriend's home.  He said that he knew one of the other men from construction work and came to the motel room that day to share a meal.

Defendant denied knowing about the drugs in his suitcase, but said that the money police found was his savings.  He denied using or selling any drugs, except for occasional use of marijuana.

Detectives asked defendant to tell the truth.

Defendant insisted that the drugs were not his and that he did not know who owned the drugs.  He admitted ownership of the cell phone on the table and the black Honda in the motel parking lot.

### 2. *Defendant's motion to suppress*

Prior to the commencement of trial, defense counsel filed a motion to suppress defendant's statement at the motel on the basis that it was obtained in violation of defendant's *Miranda* rights because he was in custody and subjected to interrogation. Following argument, the trial court denied defendant's motion to suppress.  The court determined that detectives asked "preliminary" questions during a "preliminary investigation" that did not violate *Miranda*.  To the extent that the detectives' questions went beyond the permissible scope of questioning, the trial court stated that defendant did not answer those questions or provide substantive answers, "so there's nothing to suppress."

### B. Relevant law

Under *Miranda*, police officers must advise a person of specific Fifth Amendment rights before obtaining any statements during a "'custodial interrogation.'" (*People v. Farnam* (2002) 28 Cal.4th 107, 180 (*Farnam*).)  "Custodial interrogation" means that law enforcement initiated questioning "after a person has

11

been taken into custody or otherwise deprived of his freedom of action in any significant way." (*California v. Beheler* (1983) 463 U.S. 1121, 1123.)

Among the factors to be considered in determining whether a suspect was in custody are: (1) whether the suspect was formally arrested; (2) the length of the detention; (3) the location of the interrogation; (4) the officer-suspect ratio; and (5) the demeanor of the officer and nature of the questioning. (*People v. Forster* (1994) 29 Cal.App.4th 1746, 1753.) When determining whether a suspect was in custody, "it is the totality of circumstances that is relevant; 'no one factor is dispositive.' [Citation.]" (*Forster*, *supra*, at p. 1754.)

A person who is temporarily detained and subject to investigatory questioning is not necessarily in custody for purposes of *Miranda*. (*Berkemer v. McCarty* (1984) 468 U.S. 420, 439–440 (*Berkemer*); *People v. Forster*, *supra,* 29 Cal.App.4th at p. 1754.) The term "'custody'" generally does not include a temporary detention where an officer asks a moderate number of questions to determine a person's identity and to try to obtain information confirming or dispelling the officer's suspicions. (*Farnam*, *supra,* 28 Cal.4th at p. 180.) Indeed, *Miranda* itself held that "[g]eneral on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process is not affected by our holding. . . . In such situations the compelling atmosphere inherent in the process of in-custody interrogation is not necessarily present." (*Miranda, supra,* 384 U.S. at pp. 477–478.)

This investigatory exception to *Miranda* applies, for example, "[w]here an individual has been detained incident to a search warrant, and officers' questioning stays within the bounds of questioning permitted during a [*Terry v. Ohio* (1968) 392

U.S. 1 (*Terry*)] stop." (*United States v. Davis* (9th Cir. 2008) 530 F.3d 1069, 1081.)

Whether a person was in custody for *Miranda* purposes is an objective test. (*People v. Leonard* (2007) 40 Cal.4th 1370, 1400.) Determining whether a defendant was in custody within the meaning of *Miranda* is a mixed question of law and fact. (*People v. Ochoa* (1998) 19 Cal.4th 353, 401.) "When reviewing a trial court's determination that a defendant did not undergo custodial interrogation, an appellate court must 'apply a deferential substantial evidence standard' [citation] to the trial court's factual findings regarding the circumstances surrounding the interrogation, and it must independently decide whether, given those circumstances, 'a reasonable person in [the] defendant's position would have felt free to end the questioning and leave' [citation]." (*People v. Leonard*, *supra*, 40 Cal.4th at p. 1400; *Farnam*, *supra*, 28 Cal.4th at p. 178.)

C. <u>Analysis</u>

Applying these legal principles, the trial court did not err in denying defendant's motion to suppress. Defendant was detained pursuant to a search warrant and the officers' questions were limited to try to obtain information confirming or dispelling the officers' suspicions about what they found in the motel room. In other words, defendant was not in custody at the time the officers spoke to him at the motel.

Defendant contends that he was subjected to a custodial interrogation that required a *Miranda* warning because a reasonable person would not have felt free to terminate the questioning and the questions sought to elicit incriminating responses. In fact, according to defendant, the prosecution conceded the custody issue at trial. He is mistaken.

The prosecution did not concede the *Miranda* custody issue, expressly arguing that the "custodial situation did not rise to a

level of interrogation at the motel." The prosecution merely chose not to dispute that "a reasonable person would not feel free to leave under those circumstances" at the motel. This, however, is of no moment because whether a person is in custody under *Miranda* "'is *not* whether a reasonable person would believe he was not free to leave, but rather whether such a person would believe he was in police custody of the degree associated with formal arrest.' [Citation.]" (*People v. Pilster* (2006) 138 Cal.App.4th 1395, 1403, fn. 1); see also *United States v. Pelayo–Ruelas* (8th Cir. 2003) 345 F.3d 589, 592 [rejecting *Miranda* challenge on grounds that defendant was not free to leave during brief *Terry* stop]; *United States v. Swanson* (6th Cir. 2003) 341 F.3d 524, 529 [holding defendant not subject to custodial interrogation, although not free to leave during questioning, because restraint was not akin to formal arrest].)

Indeed, a person is not free to leave during a *Terry* stop or a traffic stop but, as the United States Supreme Court explained, *Miranda* warnings are not required given the "nonthreatening" or "noncoercive" nature of such stops. (*Berkemer*, *supra*, 468 U.S. at p. 440; *Maryland v. Shatzer* (2010) 559 U.S. 98, 113 (*Shatzer*).) The questioning of defendant at the motel was likewise nonthreatening and noncoercive in nature.

Although six officers arrived to execute the search warrant, only Detectives Cornejo and Montes interviewed defendant. Detective Cornejo assisted as a translator while Detective Montes asked questions. The detectives removed the handcuffs and repeatedly said that defendant was detained but not under arrest. Nothing in the transcript suggests that the detectives were aggressive, confrontational, or accusatory with their questioning. They only asked questions that were investigative in nature and did not become threatening when defendant gave

14

evasive responses. And the questioning was not sustained or prolonged in duration, lasting approximately nine minutes.

On appeal, defendant argues that the interview required a *Miranda* warning because the detectives asked questions that sought to elicit incriminating responses about who possessed the drugs found in the motel room. Defendant seems to be referring to the "booking exception" to custodial interrogations, which allows police to ask questions when booking a suspect without a *Miranda* warning unless the questions are reasonably likely to evoke an incriminating response. (*People v. Elizalde* (2015) 61 Cal.4th 523, 535–537; see also *Rhode Island v. Innis* (1980) 446 U.S. 291, 300; *People v. Andreasen* (2013) 214 Cal.App.4th 70, 86–87; *People v. Hensley* (2014) 59 Cal.4th 788, 811.)

Defendant presents no authority or reason for extending the booking exception to these circumstances—to those detained incident to a search warrant. To be sure, the United States Supreme Court and California Supreme Court allow an officer to ask a detainee "a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions." (*Berkemer, supra*, 468 U.S. at p. 439; see also *Farnam, supra*, 28 Cal.4th at p. 180.)

Defendant further contends that his statements were involuntary and inadmissible under *Miranda* because detectives urged him to incriminate himself by saying, "'tell the truth'" and "'the more you help us, the more we can help you.'" But it is well-settled that "'mere advice or exhortation by the police that it would be better for the accused to tell the truth when unaccompanied by either a threat or a promise does not render a subsequent confession involuntary.'" (*People v. Holloway* (2004) 33 Cal.4th 96, 115.) And here, the detectives asked defendant to consider the benefit of being truthful without making any threats or promises.

15

Finally, there is no evidence that the detectives deliberately attempted to undermine *Miranda*. (*People v. Krebs* (2019) 8 Cal.5th 265, 312; see also *Missouri v. Seibert* (2004) 542 U.S. 600, 605–606 (*Seibert*) [the interrogating officer "testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique he had been taught: question first, then give the warnings, and then repeat the question 'until I get the answer that she's already provided once'"].) As set forth above, all Detective Montes wanted was to "identify whose belongings were whose and what role each person had in the room." The detective's explanation reveals only that Detective Montes could have, but did not, provide a *Miranda* warning at the time. This is not a *Miranda* violation. (*People v. Krebs*, *supra*, 8 Cal.5th at p. 312 ["simply because an officer could have given an advisement earlier is not enough to show that he delayed 'in a calculated way to undermine the *Miranda* warning'"].)

"Unlike *Seibert*, there is no evidence here that the officers were 'following a policy of disregarding the teaching of *Miranda*.'" (*People v. Scott* (2011) 52 Cal.4th 452, 478.)

Because the totality of these circumstances shows that defendant's interview was not the type of "aggressive, confrontational, accusatory, coercive, or sustained" questioning that would require a *Miranda* warning (*People v. Davidson* (2013) 221 Cal.App.4th 966, 973), the trial court's finding that the interview was "preliminary" is supported by substantial evidence. (*Farnam*, *supra*, 28 Cal.4th at p. 178; *People v. Ochoa*, *supra*, 19 Cal.4th at p. 402.) It follows that defendant's statements were properly admitted at trial.

D. <u>Harmless error</u>

Even if the trial court had erred, which it did not, any such error would have been harmless beyond a reasonable doubt.

(*Arizona v. Fulminante* (1991) 499 U.S. 279, 310 [applying *Chapman v. California* (1967) 386 U.S. 18 harmless error standard to admission of involuntary confession].) Hours after his initial interview at the motel, defendant was arrested, and detectives interviewed him at the police department jail. At that point, detectives advised defendant of his *Miranda* rights—before his second interview. As defendant gave admissible, post-*Miranda* statements that were more detailed than those given at the motel, any error in admitting defendant's earlier statements was harmless beyond a reasonable doubt. (See *Oregon v. Elstad* (1985) 470 U.S. 298, 318 (*Elstad*).)

III. *Admission into evidence of defendant's statements at the police department following a waiver of his Fifth Amendment rights*

Defendant argues that the trial court erred in admitting his subsequent post-*Miranda* statements at the police department jail because they were obtained during an unconstitutional "two-step interrogation" and "the midstream *Miranda* warning did not effectively apprise [him] of his rights[.]"

A. Relevant background

Sometime after 4:00 p.m., detectives spoke with defendant in an interview room at the prebooking area of the police department's jail. Detective Cornejo's body-worn camera recorded the interview and a transcript with translations was admitted at trial.

Defendant confirmed his last name; then Detective Cornejo read the *Miranda* warnings to defendant in Spanish. Defendant answered "Yes" to each *Miranda* question and began answering questions.

He reaffirmed his earlier statements that he had been in the motel room for a couple days and that his property included the suitcase on the bed, the cell phone on the table, the wallet,

and the cash inside the suitcase and wallet. He maintained that the drugs were not his and that, while he saw the drugs in there, he did not know who put them in his suitcase. He hinted that one of the other men could have done so, saying that he generally leaves his suitcase in the motel room and that he uses only a backpack when he goes to retrieve clothes from his girlfriend's house.

Defendant then asked detectives, "what is going to happen here" and "what's going to happen to us right now?" When detectives said that they were "asking questions" as "part of the process," defendant replied, "Yes, because since they are questions, supposedly an attorney has to be present." When asked if he wanted an attorney, he said, "well, if I'm detained, well yes. Because I wasn't told the reason why I was being detained. When they came, they didn't say, 'hey, we have a warrant.'"

Detective Cornejo asked, "I asked you four questions right?" Defendant said, "Yes, yes, yes, yes." The detective then said, "And you said you understood." Defendant then replied, "No, I did understand, I did understand." Despite defendant's admission that he understood his rights, Detective Cornejo went on to ensure that defendant understood his right to counsel: "And one of the questions . . . 'if you want an attorney, but don't have the money to pay for one, an attorney will be appointed to you, before questioning.' Do you understand that? And you said yes, right?" Defendant answered, "Yes," but expressed some doubt, asking "Can this be questioning," and then saying, "Well, I thought questioning was something else. Because had you told me . . . . [¶] . . . Because I can, I can say something." Defendant then remarked that he had not incriminated himself: "I haven't said anything", and "No, no, I mean, I don't have anything bad, or anything but . . . ."

Defendant also revealed some knowledge about police ruses, saying, "And if I don't have an attorney present, you [plural] can say whatever you [plural] want." The detective pointed out that the interview was being recorded, and then asked defendant, "So . . . do you want an attorney?" Defendant's responses was equivocal: "I don't know, I don't know, I, well, like I said, I have nothing to . . . ." The detective tried to clarify, as follows:

"[Detective]: Yeah, do you want an attorney or do you want to continue talking?

"[Defendant]: No, no, no, yes, yes, all right.

"[Detective]: *So* . . . do you want, do you want . . . ?

"[Defendant]: Yes, yes.

"[Detective]: We are no[t] forcing you to say anything.

"[Defendant]: No, no, no, no, all right.

"[Detective]: Do you want to continue talking?

"[Defendant]: No, yes, yes."

Defendant then continued answering the detectives' questions without any further mention of an attorney.

Defendant went on to say that he did not sell drugs, but that his girlfriend sometimes asks him to buy pills for her. He bought 15 pills for her two days ago from the internet; those were the blue pills found in his wallet. When detectives pointed out that similar blue pills had been found in his suitcase and in the toilet, defendant disclaimed any knowledge of them.

The trial court found that defendant's statements at the jail were admissible. It determined that "the *Miranda* warnings were correctly given" and that detectives responded appropriately by rereading the *Miranda* warning when defendant asked about an attorney.

The trial court also rejected defendant's contention that detectives used an improper two-step interrogation, finding "a

19

considerable break in the questioning between the hotel room and the police station." There was a break, in the trial court's view, in the "causal timeframe"— "It wasn't the same environment. It took time . . . to get from the hotel to the police station."

B. <u>Relevant law</u>

A waiver of a suspect's Fifth Amendment rights under *Miranda* must be "knowing, voluntary, and intelligent." (*People v. Molano* (2019) 7 Cal.5th 620, 648; *Davis v. United States* (1994) 512 U.S. 452, 458.) "In general, if a custodial suspect, having heard and understood a full explanation of his or her *Miranda* rights, then makes an uncompelled and uncoerced decision to talk, he or she has thereby knowingly, voluntarily, and intelligently waived them." (*People v. Cunningham* (2015) 61 Cal.4th 609, 642.) A waiver may be "inferred from the defendant's words and actions." (*Ibid.*)

"In contrast, a suspect's *invocation* of *Miranda* rights must be 'unambiguous[ ]' from the perspective of a reasonable officer." (*People v. Flores* (2020) 9 Cal.5th 371, 417.) "If the suspect's statement is not an unambiguous or unequivocal request for counsel, the officers have no obligation to stop questioning him." (*Davis v. United States*, *supra*, 512 U.S. at pp. 461–462.) Officers may ask questions "to clarify whether or not he actually wants an attorney." (*Id.* at p. 461.)

Generally, the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." (*Elstad*, *supra*, 470 U.S. at p. 318.) The United States Supreme Court carved out a narrow exception in *Seibert*, *supra*, 542 U.S. at page 622 for two-step interrogation procedures where officers withhold *Miranda* warnings until after the suspect confesses as part of a

deliberate plan to undermine *Miranda*'s effectiveness. (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy, J.); *United States v. Williams* (9th Cir. 2006) 435 F.3d 1148, 1158 ["This narrower test—that excludes confessions made after a deliberate, objectively ineffective mid-stream warning—represents *Seibert*'s holding"].) "In situations where the two-step strategy was not deliberately employed, *Elstad* continues to govern the admissibility of postwarning statements." (*United States v. Williams*, *supra*, 435 F.3d at p. 1158.)

    C. <u>Analysis</u>

*No two-step interrogation procedure*

Defendant contends that detectives utilized the unconstitutional two-step interrogation procedure prohibited by *Seibert*, *supra*, 542 U.S. 600. We are not convinced. *Seibert* only applies when a suspect provided an unwarned statement obtained in violation of *Miranda*. (*Seibert*, *supra*, 542 U.S. at p. 604; see *Elstad*, *supra*, 470 U.S. at p. 318.) Here, as set forth above, defendant's statements at the motel were not obtained in violation of *Miranda*; thus, *Seibert* is not implicated.

Furthermore, as set forth above, there is no evidence that the detectives deliberately attempted to undermine *Miranda*. (*People v. Krebs*, *supra*, 8 Cal.5th at p. 312; *Seibert*, *supra*, 542 U.S. at pp. 605–606.)

It follows that defendant's objection to the *Miranda* advisement because "there was no break in custody" between the hotel and the police station fails.

For the sake of completeness, we note that there was, as the trial court found, "a considerable break" between the two interviews. The first interview occurred in the hallway at the motel and continued in the motel room. The second interview and *Miranda* warning occurred hours later in an interview room at the prebooking area of the police department jail. This

"substantial break in time and circumstances between the prewarning statement and the *Miranda* warning . . . allow[ed] the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." (*Seibert*, *supra*, 542 U.S. at p. 622 (conc. opn. of Kennedy J.).) A reasonable person in defendant's shoes would have seen the interrogation at the police department jail as a markedly "new and distinct experience" from the questioning at the motel, whereby "the *Miranda* warning[] could have made sense as presenting a genuine choice whether to follow up on the earlier admission." (*Seibert*, *supra*, 542 U.S. at pp. 615–616.)

Defendant contends that the break between the two interviews was insufficient because the police custody of defendant was unbroken and, under *Shatzer*, *supra*, 559 U.S. 98, a fresh *Miranda* warning at the jail was insufficient as a matter of law. Defendant's proposition is unfounded.

*Shatzer* addressed a violation of the rule from *Edwards v. Arizona* (1981) 451 U.S. 477. (*Shatzer*, *supra*, 559 U.S. at pp. 115–116.) Under *Edwards*, "once a suspect in custody invokes his *Miranda* right to counsel, his or her subsequent statements to police are presumed involuntary and inadmissible if obtained pursuant to an 'encounter [initiated by the police] in the absence of counsel (*assuming there has been no break in custody*).' [Citation.]" (*People v. Storm* (2002) 28 Cal.4th 1007, 1023; see also *People v. Bridgeford* (2015) 241 Cal.App.4th 887, 890 ["Under *Shatzer*, law enforcement must wait 14 days before it may resume questioning (absent initiation by the suspect or with the presence of counsel) after a suspect has invoked his or her right to counsel and is released from custody"].)

Here, as set forth above, defendant was not in custody at the motel; thus, no *Miranda* advisement was required. Further, as set forth above, the break between the motel interview and jail

22

interview was sufficient.  *Shatzer* is inapplicable here—defendant never invoked his right to counsel.

Next, defendant suggests that he may not have been aware that his detention changed to an arrest despite there being no dispute that police arrested him and transported him to the police department jail.  This is not supported by the record.

Defendant seems to rely on a portion of the transcribed testimony of the jail interview where he asked detectives, "what is going to happen here" and "what's going to happen to us right now?"  To the extent defendant is complaining that police never told him that they were executing a warrant at the motel and not about his postarrest detention at the jail, that has nothing to do with the adequacy of the *Miranda* advisement.

The dialogue then shifted to defendant's understanding of his right to counsel.  The exchanges between Detective Montes and defendant, set forth in detail above, reinforce the effectiveness of the *Miranda* warning, as defendant was aware of his right to counsel and was deliberating whether to invoke it.

Despite being repeatedly advised of his rights and engaging in a discussion with detectives regarding whether to invoke his right to counsel, defendant ultimately continued answering the detectives' questions without any further mention of an attorney. The totality of these circumstances indicate that defendant understood his *Miranda* rights and that his decision to waive them was "the product of a free and deliberate choice rather than intimidation, coercion, or deception." (*People v. Molano, supra*, 7 Cal.5th at p. 648.)

That the second interview covered similar grounds as the first interview does not change the analysis.  The content of the second interview overlapped with the first at the motel, but in the second interview, detectives pursued specific information about defendant's role and knowledge about the apparent drug sales.

For example, the detective interrogated him about the drugs in his suitcase, who owned them, and how they got in there. In contrast to the motel interview, where detectives did not challenge defendant, the detectives pressed him at the jail interview for specific details and focused on inconsistencies in his story. They also inquired about his cell phone— who used his phone and what sort of messages they might find on it—and about the blue pills in his wallet. As a result, defendant expanded on his earlier answers and admitted that he saw the drugs in his suitcase and that the blue pills in his wallet were taken from his girlfriend. And, any overlap in the two interviews does not overwhelm all the other indicators that defendant's waiver of rights was voluntary.

    D. <u>Harmless error</u>

Even if the trial court had erred, which it did not, any such error in admitting defendant's statements would have been harmless beyond a reasonable doubt. (*Arizona v. Fulminante*, *supra*, 499 U.S. at p. 310.) There was ample evidence supporting the conviction. Officers found a variety of drugs throughout the motel room, as well as cash and pay-and-owe sheets. They also found defendant lying next to the bathroom with the toilet running and pills in the toilet bowl, in an apparent attempt to destroy them. These circumstances sufficiently support a finding that defendant had constructive possession of the drugs. (See *People v. Thomas* (2012) 53 Cal.4th 1276, 1284 [observing criminal liability for possession of controlled substance for sale may be based on theory of constructive possession]; *People v. Saldana* (1984) 157 Cal.App.3d 443, 454–455 [same].)

Considering the quantity and variety of drugs, the pay-and-owe sheets, the specialized drug packaging, the amount of cash, and the detective's opinion that the drugs were possessed for sale, there was sufficient circumstantial evidence that the drugs were

possessed with an intent to sell.  (See *People v. Harris* (2000) 83 Cal.App.4th 371, 374 ["Intent to sell may be established by circumstantial evidence"].)

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
CHAVEZ

25